**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

EAGLE HOSPITAL                      :
PHYSICIANS, LLC,                    :
                                    :
          Plaintiff,                :
                                    :        CIVIL ACTION NO.
          v.                        :        1:04-CV-1015-JOF
                                    :
SRG CONSULTING, INC., et al.,       :
                                    :
          Defendants.               :


                      **OPINION AND ORDER**


          This matter is before the court on Plaintiff's second motion for summary judgment on

Defendants' counterclaims [110-1]; Plaintiff's motion for leave to file excess pages [111-1];

Plaintiff's motion for summary judgment on cybersquatting claims [111-2]; Plaintiff's motion

for sanctions [120-1]; Plaintiff's motion for leave to file excess pages [121-1]; Defendants'

motion to stay [131-1]; Donald Lewis Cook's motion to withdraw as counsel [138-1]; and

Defendants' *pro se* motion for reconsideration [139-1].

**I.       Background**

          **A.       Procedural History**

          Plaintiff, Eagle Hospital Physicians, LLC, sued Defendants SRG Consulting, Inc.,

Hospitalist Physicians, Inc., and Steven R. Gerst, on April 13, 2004, alleging causes of action

of trademark infringement, unfair competition, and cybersquatting.   Defendants filed an answer and a counterclaim seeking an accounting and declaratory judgment concerning commissions owed, and alleging breach of contract and quantum meruit.   Defendant Gerst is the principal and sole shareholder of both Defendant SRG Consulting, Inc., and Hospitalist Physicians, Inc.   Pursuant to the terms of a contract between the parties, Defendants agreed to provide marketing and sales services to Plaintiff to assist Plaintiff in procuring contracts to supply hospitalist services to hospitals.

The court has issued several orders in this case.   In an order dated February 28, 2006, the court ruled on numerous issues, most notably whether commissions were owed to Defendants on certain hospitalist contracts signed by Plaintiff.   The court then held a conference on March 14, 2006 to wrap up remaining discovery issues.   Shortly thereafter, Plaintiff filed its second motion for summary judgment on certain of Defendants' counterclaims, as well as a motion for sanctions.   While these motions were pending, Defendants filed a motion to stay proceedings because the parties were scheduled to mediate their dispute in November 2006.   As the time for mediation has passed, the court DENIES AS MOOT Defendants' motion to stay [131-1].

**B.     Preliminary Matters**

In an order dated December 8, 2006, the court granted the motion of Defendants' counsel Henry D. Fellows of Fellows, Johnson & La Briola, LLP, to withdraw.   The court, however, granted Defendant Gerst leave to file a motion for reconsideration.   Shortly

2

thereafter, Defendants' other counsel, Donald Lewis Cook of McGee & Oxford, filed a motion to withdraw.

In his motion for reconsideration, Defendant Gerst contends that he and his counsel have had disagreements concerning billing, and he does not have sufficient resources to pay his legal bills. Defendant Gerst suggests that if the court released money from its registry that it holds pending the outcome of the litigation, he would be able to pay his attorneys. He also states that he would be able to pay his attorneys once he receives the commissions he is allegedly owed in this litigation. The court declines Defendant Gerst's suggestion to release to him money in the court's registry as it is clear that dispute between the parties has not been resolved. As the court indicated in its previous orders, it will not release money piecemeal to either party.

Both Defendant Gerst and his counsel allude to the fact that they also have disagreements concerning substantive issues in the case. This information is a sufficient basis alone for the court to grant the motions of Defendants' counsel to withdraw. It is not necessary and indeed would not be appropriate for the court to meet with Defendant Gerst and his counsel to discuss the matter further.

In light of this, the court DENIES Defendant Gerst's *pro se* motion for reconsideration [139-1] and GRANTS Donald Lewis Cook's motion to withdraw as counsel [138-1]. Because the pending motions discussed below have been fully briefed prior to the withdrawal of Defendants' counsel, the court will proceed to rule on those motions. However, as the court

3

indicated in its December 8, 2006 order, this court's local rules require that defendant corporations be represented by counsel. As such, the court DIRECTS Defendant Gerst to notify the court within thirty (30) days from the date of this order, of the name and contact information for his new counsel. The court notes again that failure to obtain counsel for the corporate defendants can result in default being entered against the corporate parties.

## C. Contentions

In its second motion for summary judgment, Plaintiff now argues that (1) Defendants are not entitled to commissions on the contracts that Plaintiff signed with Baptist Memorial in Columbus, Mississippi and Methodist-North in Memphis, Tennessee; (2) none of the contracts on which Defendants seek commissions is subject to a three-year commission payout outlined in an addendum to the parties' original agreement; and (3) Defendants are not entitled to commission on contracts which Plaintiff secured after it filed its first motion for summary judgment.[1]

Defendants respond that Plaintiff's second motion for summary judgment on the issue of commissions is out of order because the court permitted an extension of time to file motions for summary judgment as to the "intellectual property" issues only. Defendants also contend that Plaintiff's second motion for summary judgment is a disguised motion for reconsideration. As to the merits of the motion, Defendants argue that there are disputes of

---

[1]The court GRANTS Plaintiff's motion for leave to file excess pages [111-1].

4

fact as to whether they are entitled to commissions on the Baptist Memorial and Methodist-North contracts, as well as new contracts entered into by Plaintiff since the first motion for summary judgment was filed.   Finally, Defendants aver that under the terms of the contract they are entitled to a three-year commission period for certain contracts with "health systems."

Plaintiff also files a motion for summary judgment on its claim of cybersquatting. Plaintiff asserts that Defendants have violated the Anti-Cybersquatting Consumer Protection Act because they have registered a multitude of domain names that are the same or confusingly similar as Plaintiff's marks.   Plaintiff avers that Defendants have done so with a bad faith motive of intent to profit from the registration of those domain names as evidenced by Defendants' offer of sale of the domain names to Plaintiff and their continued use of the web sites allegedly to monitor communications between Plaintiff and its counsel.

Defendants respond that they did not have bad faith intent to profit as encompassed by the Anti-Cybersquatting Consumer Protection Act.   Specifically, Defendants allege they did not intend to divert customers from Plaintiff, did not establish a competing business, did not intend to benefit from Plaintiff's business, and registered the domain names at the direction of Plaintiff.   Defendants aver that the fact that they have offered to sell the domain names to Plaintiff is not evidence of bad faith because they were using the domain names as a legitimate business prior to offering to sell.   Defendants further argue that in its order on Plaintiff's motion for preliminary injunction, the court found Plaintiff had granted to Defendants an

5

implied license to use the trademarks.  Finally, Defendants aver that Defendant Gerst's alleged interception of attorney-client privileged material through the web sites is not relevant to the cybersquatting claim.

## II.     Discussion

### A.     Plaintiff's Second Motion for Summary Judgment (Commissions)

Defendants contend that the court should not consider Plaintiff's second motion for summary judgment because the court extended the deadline for summary judgment motions only as to Plaintiff's intellectual property claims.    Regardless of the accuracy of this assertion,[2] at least two of the three bases for Plaintiff's second motion for summary judgment relate to claims that Defendants appear to have raised after the filing of the first motion for summary judgment – that is (1) the newly-signed hospitals and (2) the claim that commissions are owed on the Synergy, Gateway, and Baptist Memorial contracts for three years as opposed to one year.   The court never ruled on any of these issues in the first motion for summary judgment.   For the same reason, the court does not agree that Plaintiff's motion is a disguised motion for reconsideration.   Finally, to the extent that the issues can be narrowed as best as possible prior to trial, the court will consider Plaintiff's second motion for summary judgment.

_____

[2]At the March 14, 2006 conference, a discussion of the filing of additional motions for summary judgment was done both in the context of the intellectual property claims, as well as any remaining claims.

6

Defendants also ask the court to strike the affidavits of Dean Griffin and Andrew Wilson filed in conjunction with Plaintiff's second motion for summary judgment because these two witnesses were never identified on Plaintiff's initial disclosures or supplement to initial disclosures. Although Defendants provide no basis upon which to contend that it would be inappropriate for the court to consider on a motion for summary judgment the affidavit of an individual not previously disclosed as a witness, the court has not relied on the affidavits of Messrs. Griffin and Wilson in determining the facts presented for summary judgment.

In its February 28, 2006 order, the court made the following rulings with respect to the issue of commissions on contracts secured by Plaintiff after the effective termination date of the Marketing and Sales Agreement signed between the parties.

> [The] court does not agree that the termination of the Marketing Agreement bars Defendants' commission as to contracts on which they performed the required actions necessary to receive commission but were actually signed after termination. In other words, if Defendants performed all the acts necessary to "secure" the hospitalist contract, but for the actual execution of the contract, then Defendants are entitled to commission even if the contract was actually executed after the termination of the Marketing Agreement. The court must next consider, then, whether Defendants performed sufficient acts with respect to those hospitals so as to earn a commission.

*See* Order, at 10. In analyzing these acts, the court considered only the activities taken prior to the November 21, 2003 termination of the contract. *Id.* at 11. The court follows the same analysis with respect to Plaintiff's second motion for summary judgment.

       1.    <u>Commissions</u>

7

In its February 28, 2006 order, the court found the following facts with respect to Baptist Memorial and Methodist-North hospitalist contracts:

> Mr. Ludwig contacted Baptist Memorial-Golden Triangle, Inc., on July 25, 2003, and sent marketing information to them on the same day. *See* Ludwig Aff., ¶ 20. He followed up with Baptist Memorial on August 1, 2003, and with several more calls over the next few months. *Id*. Mr. Ludwig participated in a three-way conference call on August 19, 2003, with the senior management of Baptist Memorial and Dr. Young of Eagle. *Id*. A site visit occurred on October 8, 2003. *Id*. Draft contracts were exchanged between December 5 and 12, 2003. *See* Young Aff., ¶¶ 18-27. The final contract was signed on February 16, 2004. *Id*.

> Mr. Ludwig contacted Methodist Health Care-Methodist Hospital North in Memphis, Tennessee on June 17, 2003. *See* Ludwig Aff., ¶ 26. He followed up on October 31, 2003, with a conversation with the Chief Medical Officer of the hospital and sent marketing materials that day. *Id*. Mr. Ludwig set up and participated in a conference call with Dr. Young, Betty Abbott of Eagle, and several officers of the hospital. *Id.*, ¶ 28. Eagle made a presentation to hospital officials in the third week of January 2004. *See* Young Aff., ¶ 19. Dr. Young and Betty Abbott made a site visit to the hospital in early February 2004. *Id*. A written proposal was made to the hospital in mid-February 2004. *Id*. Eagle signed a contract with Methodist North on April 5, 2004. *Id*.

*Id.* at 17-18. In its second motion for summary, Plaintiff also presents the affidavit of Betty Abbott, Chief Operating Officer for Eagle, who further states that on the Baptist Memorial contract, negotiations continued between the hospital and Eagle in December 2003 and January 2004, with the Chief Operating Officer of the Hospital sending an alternative draft contract on January 12, 2004. *See* Abbott Aff., ¶ 4. In response to comments from Eagle, the hospital also sent a second, marked-up draft contract to Eagle on February 6, 2004. *Id*. A final contract was signed on February 16, 2004. *Id*.

8

The court finds that a jury question exists as to whether Defendants are entitled to a commission for Baptist Memorial and Methodist-North hospitals.   With respect to Baptist Memorial, Mr. Ludwig participated in a telephone conference arranged between Plaintiff and the hospital.   A site visit to the hospital also was made prior to the termination of the Marketing and Sales Agreement.   While it is true that contracts were not actually exchanged until after the termination of the agreement, a reasonable jury could – but would not have to – conclude that through Defendants' efforts, the contract was a certainty despite the fact that the exact terms of that agreement had not yet been finalized.

Similarly, Mr. Ludwig established contacts with Methodist North in June 2003 and participated in a conference call with the hospital and Eagle.   However, because the site visit did not occur until after the termination of the agreement, and the first written proposals not made until February 2004, Defendants' position with respect to Methodist-North is not as persuasive as with Baptist Memorial.   Nonetheless, the court still determines that a reasonable jury could – but would not have to – conclude that Defendants had done all the "services necessary to secure a hospitalist contract for Eagle" by the time of termination.   Therefore, the court DENIES Plaintiff's second motion for summary judgment with respect to Baptist Memorial and Methodist-North as to both commissions under the Marketing and Sales Agreement, as well as the alternative theory of quantum meruit.

    2.    <u>Three Years for Systems</u>

9

Defendants now contend that they would be entitled to a three-year term of commissions for Plaintiff's contracts with (1) Synergy, (2) Gateway, and (3) Baptist Memorial according to an addendum signed by the parties for contracts procured with certain health systems. Under the terms of the October 1999 addendum to the Marketing and Sales Agreement, the parties agreed that:

> In the event that SRG, or any sub-agent of SRG, secures a hospitalist agreement between Eagle and a managed care organization, health plan, or other entity which owns, operates, manages, or contracts on behalf of more than one hospital, including a health system with more than one campus, Eagle shall pay SRG a percentage of net collections in the following manner: first year, five percent (5%); second year, four percent (4%); and third year, two percent (2%). Eagle shall only be responsible for paying SRG $10,000 in the first year of the hospitalist agreement, subject to the restrictions described above.

*See* Addendum to Marketing and Sales Agreement, dated October 18, 1999.

*Synergy*

Defendants have asked the court to strike the affidavit of Andrew Wilson concerning the contractual relationship involved in the Synergy contract.  As such, the only information before the court is what it had recognized in its prior order that in "2000, Eagle decided to propose a hospitalist contract with Synergy, a medical provider service operating at St. Joseph's Hospital in Atlanta, Georgia." *See* Order, at 19.  In an affidavit submitted in response to Plaintiff's second motion for summary judgment, Defendant Gerst testified that "St. Joseph's is part of the Catholic Health Care System East and the Sisters of Mercy Hospital System," *see* Second Gerst Aff., ¶ 15.  There is no evidence in the record, however, that St. Joseph's "owns, operates, manages, or contracts on behalf of more than one hospital, including a health system with more than one campus" as required in the Addendum. Therefore, the court finds that any commission owed to Defendants for the Synergy contract (as the court previously determined was a jury question) would be subject to the one-year commissions arrangement and not the three-year.

*Gateway*

On January 3, 2003, Eagle signed a contract with Gateway Health System, Inc., in Clarksville, Tennessee.  *See* Second Young Aff., ¶ 3.[3]  At the time the contract was signed,

---

[3]The court notes that Defendant Gerst disputes Plaintiff's statement related to Gateway by remarking, "denied as stated" and referring the court to Defendant Gerst's Second Affidavit. The court has reviewed the entirety of Defendant Gerst's second affidavit.   Although Defendant Gerst's affidavit does contain improper legal arguments concerning the contractual

Gateway operated a single hospital only. *Id.* Gateway did not "own, operate, manage, or contract on behalf of any hospital, health system, managed care organization, or health plan." *Id.* Eagle started working for Gateway on August 18, 2003. *Id.* On September 30, 2005, Plaintiff learned that Gateway was becoming part of a "joint venture" known as the Clarksville Health System which consists of Gateway, Triad Hospitals, Inc., and Clarksville Holdings, LLC. *Id.*, ¶ 4. Plaintiff's contract with Gateway was assigned to the joint venture as of February 1, 2006. *Id.*

The court finds that at the time Plaintiff signed the contract with Gateway and throughout the one-year commission period (from August 18, 2003 through August 17, 2004), Gateway did not "own[], operate[], manage[], or contract[] on behalf of more than one hospital, including a health system with more than one campus." Any system that Gateway became a part of after August 17, 2004, would not be relevant to Defendants' claims for commissions. Therefore, the court finds that any commission owed to Defendants for the Gateway contract would be subject to the one-year commission arrangement and not the three-year.

---

obligations for a hospital "system," it makes no factual assertions contradicting Dr. Young's testimony regarding Gateway. Therefore, the court finds the factual circumstances of the Gateway contract to be undisputed.

***Baptist Memorial***

The Baptist Memorial contract was signed only with Baptist Memorial. *See* Abbott Aff., ¶ 4. Baptist Memorial is affiliated with the Baptist Memorial System headquartered in Memphis, Tennessee, but Plaintiff provides hospitalist services only at Baptist Memorial in Columbus, Mississippi. *Id.* While it is true that Baptist Memorial is affiliated with a larger healthcare system, there is no evidence in the record that Baptist Memorial, itself, "owns, operates, manages, or contracts on behalf of more than one hospital, including a health system with more than one campus." Therefore, the commissions that might eventually be owed on the Baptist Memorial contract would also be subject to the one-year commissions period, and the court GRANTS Plaintiff's second motion for summary judgment as to the duration of commissions owed.

3.   <u>Additional Contracts</u>

Since Plaintiff filed its first motion for summary judgment, Plaintiff has signed three additional hospitalist contracts: (1) Glenwood Regional Hospital in West Monroe, Louisiana; (2) Onslow Memorial Hospital in Jacksonville, North Carolina; and (3) Clarendon Memorial Hospital in Manning, South Carolina. Defendants contend that they are also entitled to commissions on these contracts.

13

### *Clarendon Memorial*

On May 11, 2005, Sue Shugart, the Chief Operating Officer of Clarendon Memorial in Manning, South Carolina, contacted Betty Abbott expressing interesting in a hospitalist program. *See* Abbott Aff., ¶ 7. Ms. Shugart stated that she had learned about Eagle from a South Carolina company called Loris Healthcare. *Id.* Ms. Abbott sent information to Ms. Shugart and visited the hospital on November 1, 2005. *Id.* Negotiations took place and a final hospitalist contract was signed on March 27, 2006. *Id.*

Defendant Gerst has not provided the court with any activities that SRG or its sub-agents took with respect the Clarendon Memorial hospital prior to November 21, 2003. Therefore, the court finds that no reasonable jury could conclude that Defendants performed all of the "services necessary to secure a hospitalist contract for Eagle" as specified in the Marketing Agreement, and the court GRANTS Plaintiff's motion for summary judgment with respect to Clarendon Memorial.

### *Onslow Memorial*

Eagle signed a contract with Onslow Memorial on February 20, 2006. *See* Second Young Aff., ¶ 5. Onslow Hospital is listed on Defendant SRG's list of 108 "hot prospects." The list specified that Mr. Ludwig left three phone messages at the hospital between June and October 2003 and noted "no interest for now." *See* First Young Aff., ¶ 13. No additional work was performed by Defendant Gerst or Mr. Ludwig. *See* Second Young Aff., ¶ 8. In his

Second Affidavit, filed on May 23, 2006, Defendant Gerst similarly testified that Mr. Ludwig made the first contacts with Onslow Memorial on June 10, 2003; August 8, 2003; and October 27, 2003. *See* Second Gerst Aff., ¶ 7.

On October 14, 2004, Plaintiff sent a packet of information to Onslow Memorial after Dr. Young learned of the hospital's potential interest in a hospitalist program. *Id.*, ¶ 9. No other contact was made with the hospital until March 8, 2005, when Dr. Young received a message from the hospital. *Id.* On March 10, 2005, Dr. Young spoke with Penney Burlingame, a senior vice president at the hospital. *Id.* Representatives of Eagle then visited the hospital, and a contract was eventually signed in February 2006. *Id.*

Drawing all inferences in favor of Defendants, the court finds that no reasonable jury could conclude that three unreturned cold calls in the middle of 2003, more than two years prior to the eventual signing of the contract, were all of the "services necessary to secure a hospitalist contract for Eagle" as specified in the Marketing Agreement, and the court GRANTS Plaintiff's motion for summary judgment as to Onslow Memorial.

### Glenwood Regional

Eagle testifies that it signed an interim agreement with Glenwood Regional Hospital on October 14, 2005. *See* Second Young Aff., ¶ 5. The first contact between Plaintiff and Glenwood Regional occurred on June 23, 2005 when Dr. Young received a telephone call from Charlie Scott, the Chief Executive Officer of Glenwood Regional, and Lori Quinn, a vice

president at the Hospital.   *See id.*, ¶ 7.   Representatives of Eagle visited Glenwood Regional in July 2005 and made a proposal to the hospital in August 2005.   *Id.*

Defendant Gerst refers to Glenwood Regional in his Second Affidavit but does not specify any particular activity that either he or Mr. Ludwig took to secure a contract with that facility.   He does state that Dr. Young asked Defendant SRG to remove Glenwood Regional from its list of 400 contacted hospitals.   Defendant Gerst speculates that this request was made to "hide" activity done by Defendant SRG.   *See* Second Gerst Aff., ¶¶ 8-9.   But all of this is not relevant to the court's analysis of whether Defendant Gerst or any of his sub-agents did sufficient work to procure this client such that a jury might conclude they would be entitled to a commission.   Defendant Gerst's affidavit does not outline any such activity, and therefore, the court must conclude that none was undertaken.   Therefore, the court GRANTS Plaintiff's motion for summary judgment as to Glenwood Regional.

In sum, the court GRANTS IN PART AND DENIES IN PART Plaintiff's second motion for summary judgment. [110-1].

**B.      Motion for Summary Judgment (Cybersquatting)**

Plaintiff's claims under the Anti-Cybersquatting Consumer Protection Act relate to the following four domain names registered and held by Defendants: eaglehospitalphysicians.com, ehphospitalist.com, ehphospitalist.net, and ehphospitalist.info. Plaintiff contends that Defendants have acted with a bad faith intent to profit from Plaintiff's trademarks by registering the four domain names because Defendant Gerst (1) filed a

16

fraudulent affidavit with the U.S. Patent & Trademark Office claiming he owned the Eagle trademarks, (2) has registered more than 700 domain names, including 150 which incorporate Eagle trademarks, (3) requested more than $100,000 in compensation for turning the domain names over to Plaintiff, and (4) continued to use the domain names eaglehospitalphysicians.com and ehphospitalist.com to his own benefit because that is how Plaintiff contends he intercepted two e-mails containing attorney-client privileged information.   Plaintiff asks the court to determine that Defendants are liable under the Act but determine at a later time the appropriate relief to award Eagle.

Defendants respond that Plaintiff only demanded the return of the web sites once they began to generate leads for Plaintiff and Plaintiff wanted to avoid paying Defendants commissions.   Defendants further contend they only want compensation for the cost of running and developing the web sites.   Finally, Defendants aver that they shut down the web sites in the fall of 2004 and therefore are not attempting to divert customers from Plaintiff.

Eagle owns U.S. Registration No. 2,894,248 for the trademark EAGLE HOSPITAL PHYSICIANS and has used that mark in connection with its services since September 21, 1998.   Eagle also owns trademark EHP HOSPITALISTS and has used it in connection with its services since October 22, 2002.   Eagle has operated a web site under the domain name ehphospitalists.com since the fall of 2002.   Eagle owns U.S. Trademark Application No. 78,691,725 for EHP HOSPITALISTS.   The application was approved by the U.S. Patent &

17

Trademark Office on April 18, 2006.  The domain name received 514,395 "hits" from January 1, 2004 to April 27, 2006.

Defendants entered into the Marketing and Sales Agreement with Plaintiff which provides:

> [w]ith respect to (1) the work product of all work performed under this Agreement, (2) all know how, writings, works of authorship, trade secrets, improvements and discoveries contributed by SRG, and (3) all copyrightable material first produced or composed in the course of or pursuant to this Agreement, the parties acknowledge and agree that Eagle shall be the owner thereof.

*Id.*, ¶ 6.

After the signing of the Agreement, Defendant SRG registered the domain name eaglehospitalphysicians.com and operated a web site using that domain name.  A dispute concerning the content of the web site arose, and on October 17, 2002, Dr. Young informed Defendant Gerst that "the best course of action is to transfer the eaglehospitalphysicians.com name to Eagle."  *See* Plaintiff's Statement of Facts, ¶ 14.  Defendant Gerst refused Plaintiff access to the eaglehospitalphysicians.com web site, and therefore, Plaintiff registered the domain name ehphospitalists.com and developed a web site there.  *Id.*[4]  Defendants then registered the domain name ehphospitalist.com.  The parties' dispute concerning the various domain names continued.  Defendants registered approximately 150 domain names consisting

---

[4]The court notes that Defendants dispute a portion of this statement of fact but provide no citation to record evidence.  Therefore, the court must deem the fact undisputed.

18

of the Eagle marks, including the four at issue. There is no dispute that these four domain names are identical or similar to the Eagle marks. *See* Statement of Undisputed Material Facts and Response, ¶ 19.

After Eagle filed an application with the U.S. Patent & Trademark Office to register a trademark for EAGLE HOSPITAL PHYSICIANS, Defendant SRG opposed Eagle's application, and Defendant Gerst attempted to register in SRG's name, the trademarks EAGLE HOSPITAL PHYISICIANS, EAGLEHOSPITALPHYSICIANS.COM, and EHP HOSPITALISTS. The applications contained a statement that Defendant Gerst believed himself to be the owner of the trademarks sought to be registered. The parties dispute whether Defendant Gerst intentionally made a false statement on this application or whether he believed he was filling out the application correctly.

On August 18, 2003, Defendant Gerst stated that he would allow Eagle to use the eaglehospitalphysicians.com web site "in exchange for a salary comparable to [Dr. Young's] and Betty [Abbott's], and/or additional equity in the company, or a combination thereof." *See* Young Decl., ¶ 10. Defendant Gerst testified similarly. After noting that he informed Plaintiff he would turn over access to the web sites if Plaintiff would compensate him for his costs of hosting and building the web sites, Defendant Gerst stated: "I *also* requested some level of compensation equal to what Bob [Young] and Betty [Abbott] were taking out of the company for their efforts." *See* Third Gerst Aff., ¶ 18 (emphasis added). Defendant Gerst

19

considered this a "very good offer." *Id.* Similarly, at a deposition in July 2005, Defendant Gerst testified that he had asked for "hundreds of thousands of dollars" for the transfer of the domain names for the "cost of the web sites and the maintenance" and the "legal fees that [he] had to pay to defend [his] position for the commissions due" under the Marketing and Sales Agreement. *See* Gerst Depo., at 292-93. He later testified in April 2006:

> I've offered on numerous occasions to Bob Young to turn over these domain names in exchange for my costs, which he has never paid me. And some consideration for the opportunity . . . lost by each hospital that would have been brought in under these domain names, which I have already calculated to be about four hospitals a year and equivalent to Betty Abbott's salary.

Gerst (Second) Depo., at 63.

Defendant Gerst testified that he used search engine mechanics and promotional services to boost Plaintiff's web sites to higher rankings when people searched on "hospitalist" and "hospitalists." *See* Third Gerst Aff., ¶ 8. He also testified that by researching how internet search engines worked he learned that "shelf space" was a "key factor." *See id.*, ¶ 15. He decided to "purchase[] as many names involving Eagle and hospitalists as I could afford. My plan was to set them up as 'forwards' to the SRG hosted websites to take advantage of Internet 'shelf space.' . . . I purchased these sites, not to profit from their possible sale, but to promote and advance the business of Eagle." *Id.*

Defendant Gerst testified that after the lawsuit was initiated in 2004, he "voluntarily shut down the sites to avoid any 'confusion.'" *See* Third Gerst Aff., ¶ 20. He instructed the virtual host of the web sites, NTT/Verio, to turn them off. *Id.* Defendant Gerst learned at his

July 2005 deposition that some of the web sites were still accessible. *Id.*, ¶ 23. He again

contacted NTT/Verio and instructed them to shut off the sites. *Id.*, ¶ 24.

In its motion denying Plaintiff's motion for a preliminary injunction, the court

determined that up until the termination of the Marketing and Sales Agreement, Plaintiff had

granted Defendants an implied license to use Plaintiff's trademarks. However, that "implied

license terminated, at the latest, on January 26, 2004." *See* Order, dated Mar. 24, 2005, at 15.

With respect to Plaintiff's anti-cybersquatting claim, the court stated,

> Although neither party has addressed the issue in its briefing, the court finds
> that Defendants could at least make a colorable argument that they believed
> their activity to be lawful because they did not believe the Marketing or Letter
> Agreements were appropriately terminated. That argument could come within
> the "safe harbor" provision of the ACPA. Moreover, Plaintiff has not shown
> how Defendants have profited from their use of domain names allegedly
> affiliated with Plaintiff's intellectual property. Further, Defendants registered
> the names at the direction of and with the knowledge of Plaintiff, and did not
> provide false information when registering them." *Id.* at 19.

After the court denied Plaintiff's motion for a preliminary injunction, Plaintiff's

counsel wrote to Defendants and once again demanded that Defendants transfer to Plaintiff

the domain names that consisted of or were similar to Plaintiff's trademarks. Defendants

refused to do so without receiving compensation including the expenses SRG incurred in

developing and maintaining the web sites. Defendant Gerst asserts that these costs have

amounted to more than $67,000. *See* Third Gerst Aff., ¶ 6.

Under the Anti-Cybersquatting Consumer Protection Act a person alleged to be a

cybersquatter is liable to the owner of a protected mark if the cybersquatter uses a domain

21

name that is identical or confusingly similar to a distinctive mark and the cybersquatter had a bad faith intent to profit from the use of the mark. *See* 15 U.S.C. § 1125(d)(1).

The Act lists nine factors for a court to consider when determining whether the use of a domain name is in bad faith. These factors are whether the alleged cybersquatter has (1) intellectual property rights in the domain name, (2) used a domain name that consists of the legal name of a person, (3) used a domain name previously in connection with the bona fide offering of goods or services, (4) bona fide noncommercial or fair use of the mark, (5) intends to divert customers from the mark owner's location to a site that could harm the good will represented by the mark, (6) offered to sell the domain name to the mark owner, (7) provided material and false contact information when registering for the domain name, (8) registered or acquired multiple domain names which he knows are identical or confusingly similar to the marks of others, or (9) used a domain name that incorporates a distinctive or famous mark. *See id.*, § 1125(d)(1)(B)(i). The factors are not meant to be exclusive. *Id.* Finally, the statute includes a "safe harbor" which provides that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." *Id.*, § 1125(d)(1)(B)(ii). However, a party who acts even in partial bad faith may not benefit from the safe harbor. *See generally Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 270 (4th Cir. 2001), and *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 788 (8th Cir. 2004).

22

Defendants do not contest Plaintiff's assertion that its marks are distinctive.   The court further notes that since the time of Plaintiff's motion for a preliminary injunction, Plaintiff's trademark application for EAGLE HOSPITAL PHYSICIANS has been approved.   There is also no dispute that Defendants have used the domain names at issue, at least prior to the court's March 24, 2005 order on Plaintiff's motion for a preliminary injunction.   Thereafter, it is unclear whether the web sites were still active.   As the court described above, Defendant Gerst testified that he instructed the hosting company to shut the sites down, but at least at some point in 2005, search engines directed parties to the web sites.   In any event, there is no dispute that Defendant Gerst has continued to offer the sites to Plaintiff for various forms of compensation.   At least one court of appeals has held that such an offer constitutes "use" of the domain name.   *See Ford Motor Co. v. Catalonotte*, 342 F.3d 543, 549 (6th Cir. 2003) (when defendant offered to sell relevant domain name to Ford Motor Company, defendant "trafficked in the domain name for the purposes of the" Act).   Thus, the main issue is whether Defendants have acted with a "bad faith intent to profit" from Eagle's trademarks.

Some courts have described the first four factors noted by Congress as reasons why a defendant might have in good faith registered a domain name incorporating the mark of another party, while the last five factors are indicia of bad faith.   *See Coca-Cola Co. v. Purdy*, 382 F.3d at 785.   In considering the first four factors suggested by Congress, the court notes that (1) up until the effective date of the termination of the Marketing and Sales Agreement, Defendants had an implied license to use the intellectual property rights in the domain name.

However, once the court ruled on Plaintiff's motion for a preliminary injunction, Defendants were on notice that such an implied license had expired; (2) the domain names at issue do not represent a legal name of any of Defendants; (3) until the effective date of the termination of the Marketing and Sales Agreement, the domain names were used (for the benefit of Plaintiff and not Defendants) in connection with the bona fide offering of goods or services; (4) there has been no bona fide noncommercial or fair use of the mark.

With respect to indicia of bad faith, as the court noted in its order denying Plaintiff's motion for a preliminary injunction, there remains no evidence in the record that (5) Defendants intend to divert customers from the mark owner's location to a site that could harm the good will represented by the mark.   (The court discusses below Defendants' other possible financial motivations for retaining the domain names.)   There is undisputed evidence in the record that (6) Defendants offered to sell the domain name to the mark owner for more than merely compensation for registering and developing the web sites.   Defendant Gerst himself testified that those costs totaled $67,177.39 while the compensation he sought from Plaintiff was in the form of a salary akin to Betty Abbott's, or at least more than $100,000. The court rejects Defendants' assertion that these "offers" were made by Defendants to Plaintiff in the course of an attempted settlement of the lawsuit.   At least some of the discussions concerning compensation to Defendant Gerst for returning the domain names to Plaintiff occurred between Defendant Gerst and Plaintiff's representatives prior to the initiation of the instant suit.

24

There is a dispute of fact as to whether (7) Defendant Gerst provided material and false contact information when registering for the domain name, or in this case, a trademark application.   Again, there is a dispute of fact as to why (8) Defendant Gerst registered or acquired multiple domain names which he knows are identical or confusingly similar to the marks of others.   Plaintiff argues that Defendant Gerst registered 150 variants as a means of "warehousing" domain names related to Plaintiff's marks.   Plaintiff supports this contention by pointing to the fact that Defendant Gerst registered more than 700 various domain names and admitted in his deposition that he did so because he believed there would be a market for buying and selling domain names.   On the other hand, Defendant Gerst testifies that he registered so many variants of Plaintiff's names as a means of increasing the number of hits to Plaintiff's web sites, thereby raising the "rank" of Plaintiff's sites on those search engines. Finally, Defendants have not disputed that the domain names incorporate Plaintiff's mark.

Plaintiff also points to Defendant Gerst's alleged ongoing use of the domain names for unscrupulous purposes as another indicator of Defendants' bad faith.   That is, Plaintiff contends that Defendant Gerst has maintained control over the domain names and refused to turn them over to Plaintiff because he is using the web sites as a means of monitoring and intercepting e-mail communications made by Plaintiff.   In particular, Plaintiff contends that Defendant Gerst has utilized the web sites to access e-mails protected by the attorney-client privilege.

25

The court has previously addressed this issue in motions to compel and discovery hearings.  At the conclusion of the discovery hearing on March 14, 2006, the court granted Plaintiff leave to take Defendant Gerst's deposition again on the issue of the two attorney-client privileged documents Defendants attached to their response to Plaintiff's first motion for summary judgment.  In its order of February 28, 2006, the court had ruled that these attachments did constitute attorney-client information and directed Defendant Gerst to explain how he obtained the e-mails.

In his deposition taken on April 13, 2006, Defendant Gerst was represented by "special counsel" Charles Floridas of Miller & Martin and invoked the Fifth Amendment approximately 80 times in refusing to answer questions related to Defendants' use of the domain names.  Specifically, Defendant Gerst refused to testify as to whether he intercepted or continues to intercept or had the assistance of others in intercepting e-mails sent to eaglehospitalphysicians.com, eaglehospitalist.com, or ehphospitalist.com.   He would not testify as to whether he had the ability to intercept such e-mails, nor would he answer questions about whether he maintained the server that hosts those web sites.  Obviously, this is a troubling issue, and the court disagrees that Defendant Gerst's alleged use of the web site in this manner would be irrelevant to Plaintiff's cybersquatting claim.   Plaintiff could argue that such an alleged "use" of the domain name was in bad faith with an intent to profit, in the form of gaining an advantage in the instant suit.

26

This case is unique among cybersquatting suits because at the time Defendants registered the numerous domain names at issue, there was an agreement among the parties that Defendants would develop and utilize web sites as a means of attracting clients to Plaintiff's business. At that time, therefore, there was no evidence of bad faith on the part of Defendants. For this reason, Defendants' actions do not fit the "paradigmatic harm" that the Anti-Cybersquatting Act was designed to protect against, i.e. "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *See Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004).

There is no question, however, that a dispute arose among the parties and that the true owner of the marks, Plaintiff, at some point demanded that Defendants return the domain names to Plaintiff. Defendants refused to do so because Defendant Gerst believed that Plaintiff owed him money and unfairly terminated the Marketing and Sales Agreement. It is clear from Defendant Gerst's own testimony that he seeks more than merely the costs of developing and maintaining the web sites as compensation for turning over the domain names to Plaintiff. In essence, therefore, Defendant Gerst is holding the domain names hostage or as leverage to secure what he believes to be a more appropriate level of commissions out of Plaintiff than he has received thus far. This testimony would certainly indicate an intent to "profit" although not through means of the web sites themselves. *See Coca-Cola Co. v. Purdy*, 382 F.3d at 786 ("'profit' includes an attempt to procure an 'advantageous gain or

27

return'"). The court finds there is evidence that Defendant Gerst intended to profit from the transfer of the domain name to Plaintiff, but there is no evidence that Defendants intended to "divert" customers.    For this reason, the court DENIES Plaintiff's motion for summary judgment on the cybersquatting claim.

28

## C.     Sanctions[5]

After the conclusion of discovery, Plaintiff filed a motion for sanctions against Defendants pursuant to Rule 37(b)(2) and the court's inherent powers.  Plaintiff argues that (1) Defendants refused to answer questions concerning their ability to monitor communications between Plaintiff and Plaintiff's counsel, and thus, Plaintiff is left with the possibility that Defendants are monitoring its communications; (2) Defendants have not paid attorney's fees directed by the court to be paid immediately; and (3) Defendants failed to produce all documents responsive to the court's orders.  Plaintiff asks the court to strike Defendants' Answer and Counterclaim and enter a default judgment against them, as well as awarding Plaintiff its attorney's fees.

Defendants respond that they have in good faith complied with the court's discovery orders and that the sanction of default is overreaching because Plaintiff has not demonstrated that a lesser sanction would suffice.  Defendants contend that Plaintiff did not seek Defendant Gerst's 2005 income tax returns in its original discovery responses and that any of the contract documents that might not have been produced on time were inadvertently missing from the production.  Defendants argues that Defendant Gerst's possession of two documents protected by the attorney-client privilege are not relevant to the issues involved in the

---

[5]The court GRANTS Plaintiff's motion for leave to file excess pages [121-1].

litigation.   Finally, Defendant Gerst avers that he is unemployed and cannot pay the $3,750 in attorney's fees.

At a hearing on March 14, 2006, the court discussed Defendants' attachment of documents protected by the attorney-client privilege to Defendants' response to Plaintiff's first motion for summary judgment.   Because the circumstances of the acquisition of the documents at least allowed an inference that Defendant Gerst might have the ability to monitor communications between Plaintiff and Plaintiff's counsel, the court granted Plaintiff leave to take Defendant Gerst's deposition concerning how he obtained these documents.   The court considered the possibility that Defendant Gerst would refuse to answer those questions based upon an assertion of the Fifth Amendment and informed Plaintiff that it could revisit the issue of sanctions with the court in the event that happened.

Plaintiff makes two separate arguments related to this issue.   The first, obviously, is that Defendants' refusal to answer these questions leaves Plaintiff not knowing whether Defendants have obtained an unfair advantage in the litigation due to an assumed ability to intercept privileged communications.   The court clearly must deal with this situation and addresses it below.   The second, however, is less persuasive.   Plaintiff argues that it proffered discovery requests to Defendants which would encompass the allegedly intercepted communications.   Because Defendants have not turned over any documents (save for the two attached to their response), Plaintiff avows that Defendants have not fully complied with discovery as ordered by the court.   Even if the court had direct evidence that Defendants had

30

the ability to intercept these communications, there is no evidence that Defendants would still have these communications in their possession and, thus, had failed to comply with discovery requests by not producing such documents.   Defendants' alleged possession of such documents is merely speculative at this point.   Therefore, the court denies Plaintiff's motion for sanctions to the extent it argues Defendants have not fully responded to discovery requests by not turning over more materials protected by the attorney-client privilege.

At its June 20, 2005 discovery hearing, the court also directed Defendants to produce certain financial records.   The document request in question sought tax returns "since 1998" and financial records "since January 1, 1999."   The court instructed Defendants to produce tax returns but did not discuss a particular time frame.   *See* Transcript, at 26-27.   Defendants turned over the tax records for 1998 through 2004 but contend that Plaintiff did not request the 2005 tax returns until a letter of April 14, 2006.   Obviously at the June 20, 2005 conference, Defendants' 2005 tax returns were not yet available.   The court finds that it is not particularly clear as to whether the 2005 tax records should have been produced.   At best, the record is silent on this issue.   Plaintiff did not file a motion to compel on this issue or previously raise it with the court, and the court finds that it cannot form the basis for sanction against Defendants.

Next, Plaintiff argues Defendants did not produce certain documents the court had ordered to be produced on June 20, 2005 (relating to contracts or agreements with certain health care companies) until May 18, 2006, after the close of discovery and after the

31

completion of Defendant Gerst's second deposition.   Defendants respond that the documents had been turned over in discovery, but a CD-ROM containing the documents inadvertently had not been produced.   Although the parties disagree, it is possible that the CD-ROM contained several documents that had not previously been produced.   There is no evidence in the record, however, that Defendants engaged in any bad faith with respect to this discovery dispute, nor is there any evidence to show that Plaintiff was prejudiced by Defendants' alleged failure to turn over all of the documents.

In its February 28, 2006 order, the court directed Defendants to pay to Plaintiff $3,750 in attorney's fees for Defendant Gerst's failure to appear at his first scheduled deposition, as well as for costs related to Plaintiff's motion to compel.   *Id.* at 29-30.   Defendants have yet to pay this amount to Plaintiff.   Defendants contend that they are unable to pay because they do not have the money.   Defendant Gerst states that he is unemployed, is "at risk" of being evicted from his apartment, and has not been able to pay his own attorney's fees for "many months."   *See* Fourth Gerst Aff., ¶ 3.   The court finds that this argument is made without any evidentiary basis in the record.   Defendants have not previously applied for *in forma pauperis* status, they have not provided any affidavit testimony as to any indigency, nor have they previously sought relief from the court.   Rather, the court finds, Defendants have simply refused to pay the attorney's fees as directed.   The court finds this failure can form the basis for sanctions.

32

The court DIRECTS Defendants to pay to Plaintiff the $3,750 in attorney's fees the court ordered at its March 14, 2006 hearing, within thirty (30) days from the date of this order.   The court warns Defendants that if this amount is not paid within the time frame, Defendants could face any sanction from the court up to and including striking Defendants' defenses and counterclaims.

The court now turns to Defendant Gerst's refusal to answer questions related to the manner in which he obtained the two privileged documents at issue.   The court disagrees with Defendants' argument that the issue is not relevant to the instant litigation.   At the March 14, 2006 hearing, the court stated:

> It is not inconceivable to me that he may take a Fifth Amendment privilege, and if he does, I'll deal with that.  As I said, I don't want this to take on a life of its own.   I think in fairness if somebody is eavesdropping on your conversations with your client or even eavesdropping on the client's conversations with itself that you are entitled to know because it has ramifications for how you handle the case.  . . .  I'm not going to worry about sanctions at the moment.  Conduct your deposition, come back and tell me what you've learned.  And if you want sanctions I will consider it.  I don't promise what I'll do.

Transcript, at 30-31.   Because Defendant Gerst did refuse to answer such questions as the court anticipated, the court must address the issue of sanctions and the manner in which the litigation should proceed.

Before the court could impose the extreme sanction of default as requested by Plaintiff, the court desires to hear the parties on this matter.   Although the problem of intercepted communications is a serious one complicated by the Fifth Amendment issue, it

33

is not clear to the court that a lesser sanction would not suffice.  However, it also appears to the court that to this point, Defendants have not understood the gravity of their obligations in this litigation.   This is evident at the very least in Defendants' refusal to pay the $3,750 ordered by the court.

As the court noted above, it has granted Defendants' counsel's motions to withdraw. The court finds under these circumstances that Defendants need time to secure the representation of counsel.   Further, those new counsel should also have the opportunity to review the case and prepare to represent Defendants.   Therefore, after new counsel have filed a notice of appearance, the court will set this matter down for a hearing concerning the manner of sanction that should be imposed on Defendants.   The court GRANTS IN PART AND DENIES IN PART Plaintiff's motion for sanctions [120-1].

34

### III.    Conclusion

The court GRANTS IN PART AND DENIES IN PART Plaintiff's second motion for summary judgment on Defendants' counterclaims [110-1]; GRANTS Plaintiff's motion for leave to file excess pages [111-1]; DENIES Plaintiff's motion for summary judgment on cybersquatting claims [111-2]; GRANTS IN PART AND DENIES IN PART Plaintiff's motion for sanctions [120-1]; GRANTS Plaintiff's motion for leave to file excess pages [121-1]; DENIES AS MOOT Defendants' motion to stay [131-1]; GRANTS Donald Lewis Cook's motion to withdraw as counsel [138-1]; and DENIES Defendants' *pro se* motion for reconsideration [139-1].

The court DIRECTS Defendant Gerst to notify the court, within thirty (30) days from the date of this order, of the name and contact information for his new counsel.  The court notes again that failure to obtain counsel for the corporate defendants can result in default being entered against the corporate parties.

The court DIRECTS Defendant Gerst to pay to Plaintiff $3,750 in attorney's fees the court ordered at its March 14, 2006 hearing, within thirty (30) days from the date of this order.  Failure to do so can result in sanctions up to and including default.

The Clerk of the Court is DIRECTED to serve this order on Defendants Dr. Gerst, SRG Consulting, and Hospitalist Physicians, Inc., at their last known address of: 1010 Seminole Drive, Suite 811, Ft. Lauderdale, Florida 33304.

The Clerk of the Court is DIRECTED to resubmit this matter when Defendants' counsel files a notice of appearance or in thirty (30) days from the date of this order, whichever occurs sooner.

**IT IS SO ORDERED** this 14th day of March 2007.


                    s/ J. Owen Forrester
                    J. OWEN FORRESTER
        SENIOR UNITED STATES DISTRICT JUDGE

36